1

**STANFORD H. ATWOOD, JR.  (SBN 37362)**
stanford@atwoodlaw.com

2

**ERIC S. HAIMAN (SBN 139764)**
eric@atwoodlaw.com

3

**DANIELLA R. SIMON (SBN 205211)**
daniella@atwoodlaw.com

4

**ATWOOD, HAIMAN & WESTERBERG**
**18805 Cox Avenue, Suite 200**

5

**Saratoga, California 95070-4183**
**Telephone:  (408) 370-5070**

6

**Facsimile:   (408) 370-5725**

7

8

Attorneys for Cross-Complainants PAUL
G. ROBINSON, DIANNE EVANS, and
OPEN HEARTH LLC

9

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

[ORIGINATING COURT:
SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
UNLIMITED JURISDICTION]

13

14

| | |
|---|---|
| PERLA VEGA, BARBARA VEGA, NORMA SALAZAR, | U.S.D.C. Case No. C07 -02263 EDL (ADR) |
| Plaintiffs, | Date of Removal: 04/25/07 Assigned to: Elizabeth D. Laporte (U.S. Magistrate Judge) |
| v. | [Contra Costa County Superior Court Case No. C06 00459] |
| PAUL G. ROBINSON, et al., | |
| Defendants. | [PROPOSED] SECOND AMENDED COUNTER-CLAIM FOR FRAUDULENT CONCEALMENT, INTENTIONAL MISREPRESENTATION, NEGLIGENT MISREPRESENTATION, FRAUD, DISHONEST DEALING, BREACH OF FIDUCIARY DUTY, PROFESSIONAL NEGLIGENCE, BREACH OF CONTRACT, WASTE, EQUITABLE AND COMPARATIVE INDEMNITY, VIOLATION OF CALIFORNIA DUE PROCESS CLAUSE |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] SECOND AMENDED CROSS-COMPLAINT

1

PAUL G. ROBINSON, DIANNE EVANS,
OPEN HEARTH LLC,

2

3

      Cross-Complainants,

4

v.

5

KEVIN NORD, SEC PAC, INC. dba
SECURITY PACIFIC REAL ESTATE
BROKERAGE, MICHAEL RICHARD
CLANCY, RICHARD JOSEPH CLANCY,
CRAIG GREENWOOD, HI-TECH
INSPECTIONS, ALEX CONTRERAS,
DIABLO ROOFING CO., INC., ACES
PLUMBING, CITY OF PITTSBURG,
JOHN LITTLE, K.C. KAMPTON, and
ROES 2 through 20, inclusive,

6

7

8

9

10

      Cross-Defendants.

11

12

      COME NOW Cross-Complainants PAUL G. ROBINSON, DIANNE EVANS, and OPEN

13

HEARTH LLC ("Cross-Complainants") and allege as follows:

14

### GENERAL ALLEGATIONS

15

      1.      Cross-Defendant KEVIN NORD ("Nord") is an individual and, at all relevant times

16

alleged herein was, an agent of SEC PAC, INC. dba SECURITY PACIFIC REAL ESTATE.

17

      2.      Cross-Defendant SEC PAC, INC. dba SECURITY PACIFIC REAL ESTATE

18

("Security Pacific") is now, and at all times mentioned in this cross-complaint was, a corporation

19

qualified to do business and doing business in the State of California and a corporate licensee of the

20

California Department of Real Estate ("DRE").

21

      3.      Cross-Defendant MICHAEL RICHARD CLANCY ("M. Clancy") is now, and at all

22

times mentioned in this cross-complaint was, an individual, and a licensed officer of Security Pacific.

23

      4.      Cross-Defendant RICHARD JOSEPH CLANCY ("R. Clancy") is now, and at all times

24

mentioned in this cross-complaint was, an individual, and a licensed officer of Security Pacific.

25

      5.      Cross-Defendant CRAIG GREENWOOD ("Greenwood") is now, and at all times

26

mentioned in this cross-complaint was, an individual resident in the State of California.

27

      6.      Cross-Defendant HI-TECH INSPECTIONS ("Hi-Tech") is now, and at all times

28

mentioned in this cross-complaint was, a business entity of unknown form doing business in the State of California.

7.     Cross-Defendant ALEX CONTRERAS ("Contreras") is now, and at all times mentioned in this cross-complaint was, an individual resident in the State of California.

8.     Cross-Defendant DIABLO ROOFING CO., INC. ("Diablo") is now, and at all times mentioned in this cross-complaint was, a corporation licensed to and doing business in the State of California.

9.     Cross-Defendant PERLA VEGA ("P. Vega") is now, and at all times mentioned in this cross-complaint was, an individual resident in the State of California.

10.     Cross-Defendant BARBARA VEGA ("B. Vega") is now, and at all times mentioned in this cross-complaint was, an individual resident in the State of California.

11.     Cross-Defendant NORMA SALAZAR ("Salazar") is now, and at all times mentioned in this cross-complaint was, an individual resident in the State of California.

12.     Cross-Defendant ACES PLUMBING ("Aces") is now, and at all times mentioned in this cross-complaint was, a business entity of unknown form doing business in the State of California.

13.     Cross-Defendant CITY OF PITTSBURG ("the City") is now, and at all times mentioned herein was, a local government entity, organized under the laws of California, with jurisdiction over the Property, as defined below.  The City, as a municipality organized under the laws of California, has the power of eminent domain.

14.     Cross-Defendant JOHN LITTLE ("Little") is now, and at all relevant times mentioned herein was, the Building Official for the City of Pittsburg's Department of Building Inspections.

15.     Cross-Defendant K.C. KAMPTON ("Kampton") is now, and at all relevant times mentioned herein was, the Building Inspector for the City of Pittsburg's Department of Building Inspections.

16.     Cross-Complainants are ignorant of the true names and capacities of the cross-defendants sued herein as ROES 2 through 20, inclusive, and therefore sue these cross-defendants by such fictitious names.  Cross-Complainants will amend this cross-complaint to allege their true names and capacities when ascertained.

17.     Cross-Complainants are informed and believe and thereon allege that each of the fictitiously named cross-defendants is responsible in some manner for the occurrences herein alleged, and that Cross-Complainants' damages were directly and proximately caused by these cross-defendants.

18.     Cross-Complainants are further informed and believe and thereon allege that at all material times mentioned herein, the cross-defendants, and each of them, including the ROE cross-defendants, were the agents, servants and/or employees of their co-cross-defendants, and in doing the things hereinafter alleged, were acting within the course and scope of their authority as such agents, servants and/or employees and with the permission, consent and ratification of their co-cross-defendants.

19.     In or about May 2002, Cross-Complainants PAUL ROBINSON ("Robinson") and DIANNE EVANS ("Evans") met cross-defendant Nord.  Nord represented that he was a licensed real estate agent with substantial experience in representing clients in the acquisition of commercial real estate.  Robinson and Evans told Nord that they were new to real estate investment and needed professional advice and help in getting started.  Nord told Robinson and Evans that he had a great deal of experience with the sort of investment they were interested in and would help them learn what they needed to know and would refer them to other professionals and services that they would need.

20.     Nord acted as a dual agent for Cross-Complainants as buyers and cross-defendant Greenwood, the seller of the property located at 1062 Beacon Street, Pittsburg, California, 94565 (the "Property").  Nord recommended the Property to Robinson and Evans as the most suitable one on the market given their needs.  Nord recommended that Cross-Complainants offer the list price for the Property, and they did so.  Nord told Robinson and Evans that the price would be negotiated after the walk through and that the list price was a very good price for the Property.

21.     On or about May 15, 2002, Cross-Complainants made an offer to purchase the Property. On May 16, 2002, Greenwood made a counteroffer, which was accepted on or about May 20-21, 2002. Nord told Cross-Complainants that the termite inspection done on behalf of Greenwood was all they needed to be assured that the Property was in good condition.  Nord told Cross-Complainants to avoid dealing with the City and its inspectors.  Nord told Cross-Complainants that given the price they were

[PROPOSED] SECOND AMENDED CROSS-COMPLAINT

1    paying and the City of Pittsburg's involvement they could be certain the building was basically sound.

2        22.    Cross-Complainants decided to obtain an inspection.  On May 24, 2002, an inspection

3    was done by Alex Contreras of Hi-Tech Inspections.  Dianne Evans and Paul Robinson walked the

4    Property with him.  Contreras said the building was not in great shape and had a lot of deferred

5    maintenance, but that it was structurally sound.  He told Evans that the only big problem was the

6    plumbing.  He told Evans the roof was not well done, but was only five to eight years old and was not

7    a big concern.

8        23.    On or about June 12-13, 2002, Cross-Complainants and Greenwood entered into an

9    addendum to the purchase agreement.  The addendum provided as follows:

10           Buyer does hereby remove document and inspection as a contingency
              if the following items are agreed to by Seller:

11
12           The Buyer will need a letter from the appropriate City officer as to
              completion, per City request;

13           Seller to deliver to Buyer a termite clearance;

14           Seller to have all units rented in order to obtain a new loan.  Buyer to
15           approve new tenants, not to be unreasonably withheld;

16           Seller to credit Buyer $2,000.00 for any and all other repairs;

17           Seller to Deliver Estoppel to Buyer within 3 days;

18           All tenants to be current in rent;

19           Seller agrees to furnish buyer with release/letter from City of Pittsburg
              for completion of specified/said repairs regarding City Action.

20       24.    Greenwood did not give Cross-Complainants any information about applicants before

21    renting out all of the units.  Nord told Cross-Complainants not to worry about this because it would

22    just slow things down, and the tenants could not be evicted now anyway.

23       25.    Cross-Complainants also asked Nord to have Greenwood stop making "repairs" on the

24    building as it appeared that many would have to be re-done.  Neither Nord nor Greenwood did

25    anything to address these concerns.   The problems that this caused for Cross-Complainants included

26    that the lender and insurer required that defective work that Greenwood did on the external stairs for

27    units 1 and 2 be re-done before the loan would be funded.

28       26.    On or about June 26, 2002, Cross-Complainants created an LLC and wanted to buy the

Property through it.  Nord recommended it would be better to buy the property in Robinson's name and then transfer it to the LLC because it would take too much time and delay closing the transaction. After close of escrow, Nord told Cross-Complainants he did not know how to transfer the Property into an LLC without triggering a taxable event.

27.     On or about June 28, 2002, the City of Pittsburg posted a "Dangerous Property Do Not Occupy" notice on the Property.  On July 27, 2002, Evans found units 4 and 5 posted with notices from the City, found a pulled electrical meter and standing water in the basement.  Cross-Complainants sent a letter to Nord asking him what was going on.   They received no satisfactory response.  In June, July and August 2002, Cross-Complainants were advised by Nord to apply jointly to Washington Mutual for a mortgage on the Property.  Before loan approval, Nord told Cross-Complainants, contrary to his earlier directions, not to include the LLC on the mortgage as it would take too long and complicate matters.

28.     On September 19, 2002, the City issued a Certificate of Occupancy for Units 1-6.  In October 2002, the transaction closed escrow at North American Title Company, Escrow No. 5470252200495, at branch address 1555 Riviera Avenue, Suite G, Walnut Creek, California, 94596.

29.     On or about December 16, 2002, Cross-Complainants received a call from a tenant, stating that there was flooding in the basement. Nord referred Cross-Complainants to Aces Plumbing. There was three feet of standing water in the basement and the sump pump was not working.  Aces said it was an old pump, had to be replaced, and that there was a leak in the drain line that also had to be repaired.  Later in December and again on or about January 2, 2003, Cross-Complainants had to call Aces back out due to continued flooding, a leak at the same point in the drain, and the fact that the pump was still not working.  Cross-Complainants paid another $4,036.00.

30.     In August 2003, a tenant in unit 6 reported leaking in the doorway to the bathroom. Cross-Complainants hired Augie's Plumbing.  The plumber found drain lines from both of the upstairs units 1 and 2 were leaking badly and draining down into unit 6's bathroom door and ceiling.  Part of the wall in the back of the building had to be opened to replace old cast iron drains that were leaking. The plumber showed Cross-Complainants the leak Aces said it was repairing, and it was a huge crack running lengthwise down the cast iron drain pipe under unit 3.  The plumber found two problems with

the sump pump: 1) an intermittent GFI it was plugged into, and 2) sediment was getting into the pump and burned it out.  He replaced the GFI and screened the pump.  When the plumber was redoing the bathrooms in Units 2 and 5 he found where Greenwood had put up new sheetrock over the top of old sheetrock which was black with mold.

31.    Plumbing repairs were ongoing for months.  Several tenants moved out because of this. Cross-Complainants resurfaced walls and ceilings and installed new carpets in vacated units 1, 2, 3 and 5.  They also installed new kitchen cabinets and re-did the bathrooms in these units.

32.    In December 2004, the tenant in unit 1 notified the Cross-Complainants that the windows were leaking.  The tenant refused to allow workmen in on two occasions, despite proper notice.  Cross-Complainants had East County Glass & Window inspect all the windows.  East County told Evans there was essentially nothing wrong with the windows. They told her that the problem with the windows was that they were single pane aluminum frame and sweated in cold weather.  Cross-Complainants were prepared to replace all of the windows if necessary. Later, another  window man, showed Evans where the drain holes on the windows had been painted and/or molded closed so that they couldn't drain.

33.    In June 2005, B. Vega and her family, who had been living unknown to Cross-Complainants with P. Vega in unit 2, moved into unit 4.  P. Vega refused to pay rent for July 2005. She claimed it was because the bathroom vanity leaked and there were cockroaches, but would not allow the handyman in to repair the leak and would not allow Discovery Pest Control, with which Cross-Complainants had a monthly service agreement, to enter.  Instead of allowing the repairs. P. Vega complained to the City about the condition of her apartment.

34.    On July 28, 2005, Cross-Complainants posted a notice on unit 2 regarding fixing the vanity.  On July 29, 2005, the children let Evans and the handyman into unit 2, but P. Vega stopped them and called her husband.  P. Vega told Evans she did not want Evans to fix the leak until after a City inspector saw it.  Cross-Complainants mailed a notice to enter and make repairs to P. Vega and on the weekend of August 6, 2005, Cross-Complainants made repairs.

35.    On or about August 20, 2005, Cross-Complainants received a notice from the City, stating that they had ten days to clear a list of stated violations.  The City said it was requiring a

termite and pest control report, roof inspection, general contractor's inspection of bathrooms and windows, and a plumber's inspection of modifications to piping and relocation of water heaters. Cross-Complainants complied and sent the reports to the City.

36.     On or about September 15, 2005, Cross-Complainants received a Notice to Abate Nuisance.  When Evans called the City on or about September 20, 2005, Curtis Smith, the Chief Building Official, told her that the City does not talk to property managers.

37.     On or about September 29, 2005, Cross-Complainants met with Curtis Smith and KC Kampton, a building inspector, and Officers Reposa and Bancroft, also of the City.  Smith said the biggest problem was with improper installation of water heaters and that once a permit issued for them, the City would work with them on the other repairs.  He told Cross-Complainants that their plumber, Augie, was not a licensed plumber.  He said this made his report useless and that Cross-Complainants would not be able to get the plumbing permit required by the City.  Smith said it was as if whoever installed the heaters was trying to kill the tenants.  Smith said the HomeGuard termite report was very thorough and the City would use it as a basis for clearing all the violations.  Cross-Complainants were also told that though they were not a corner lot, they would be held to the requirements for a corner lot.  Officers Reposa and Bancroft told Cross-Complainants that the tenant in unit 1 was a criminal and Cross-Complainants had to evict him, but admitted they did not have grounds to evict.

38.     On October 3, 2005, Bart from Ben Franklin Plumbing met Evans at the Property to quote water heaters.  He said that if the City did not approve what Augie had done, there was no way to please the City.  He said there was plenty of drop to the sump pump and combustion air calculations only applied to water heaters placed in closets.  He declined the job because the City was making up rules as it went.  Cross-Complainants could not get any other plumbers from the list provided to them by the City to quote the job.  Many were not interested when they heard what the City wanted.

39.     Cross-Complainants discovered that, contrary to Smith's statement, Augie was a licensed plumber.  On October 25, 2006, Augie got a permit for the water heaters.  The City required replacement with "shorties" on stands with holes drilled for increased air flow and to change the flues.

40.     The tenant in unit 4, B. Vega,  told Evans she had no electricity in part of her unit.

[PROPOSED] SECOND AMENDED CROSS-COMPLAINT

1   PG&E checked and found no problems.  Wires from a wall lamp were pulled out of the wall and poked

2   into the power cord, extension cords hung all around.  On or about November 11, 2005, Greg Peterson

3   of City Wide Electric met Evans at unit 4 and repaired the problems.

4        41.      On or about November 11, 2005, the tenant in Unit 1 complained of leaking.  Cross-

5   Complainants had East County recheck and were told the roof was leaking.  Cross-Complainants

6   contracted with Diablo Roofing to make repairs.  They explained to Diablo the need for permits.

7   Diablo told them permits were not required.  On December 6, 2005, they began the repairs and within

8   fifteen minutes, the City shut the work down for not having permits.

9        42.      Since the beginning of 2006, the City has issued administrative citations and posted the

10  Property with notices, including one stating  "dangerous building must vacate."  On or about January

11  17, 2006, the tenant in unit 1 called Cross-Complainants and said the City was coming out to turn off

12  the water and PG & E and all tenants had to move out by January 20, 2006.

13       43.      The building inspector told Evans that the tenant in unit 4 told him that Evans had

14  pulled the light fixture wires out of the wall and strung up all the extension cords in unit 4 and the

15  children had been shocked. He said the kids backed up what the tenants said.  Subsequently, B. and

16  P. Vega admitted to Evans that they had un-wired the lights because they thought it would lower the

17  electric bill. B. and P. Vega  also admitted that they had disconnected gas wall furnaces to reduce the

18  gas bill.

19       44.      In the course of undertaking repairs  mandated by the City, Cross-Complainants

20  discovered extensive dry rot and other damage, so severe that a major portion of the building has to

21  be entirely re-built.  Based on evidence of prior attempted repairs and the extent of damage, Cross-

22  Complainants are informed and believe that Greenwood and his agents, as well as the City, were aware

23  that the building was essentially valueless and yet nobody disclosed this to Cross-Complainants before

24  the purchase of the building.  When sheetrock was removed in units 3 and 4 in March 2004, severe

25  dry rot was exposed.  Cross-Complainants are informed and believe that Greenwood had to know

26  about this condition because there were places where he had made small repairs, and the problem was

27  at least 12-15 years old.

28       45.      B. Vega broke two windows, knocked numerous holes in the bedroom wall and pulled

electrical wiring out of the walls.  The cost to repair these items was $679.32.

46.     B. Vega owes $2,721.43 for rent and $325 in late fees, plus $750 for eviction retainer, for a total of $3,796.43

47.     P. Vega owes $1,774.29 for rent and $90 for late fees less her deposit of $1,000, for a total of $864.29.

48.     Norma Salazar owes $428.47 for partial rent for the month of February 2006.

**FIRST CAUSE OF ACTION**

**(Fraudulent Concealment - Against Craig Greenwood, Kevin Nord, Security Pacific Real Estate,  Michael Richard Clancy, Richard Joseph Clancy)**

49.     Cross-Complainants incorporate herein by reference the allegations set forth in paragraphs 1 through 48 above.

50.     Cross-Defendants and each of them knew or should have known of the existence of conditions rendering the Property uninhabitable, in need of major reconstruction or demolition, including but not limited to extensive dry rot, water damage and other deterioration of structural elements of the building.

51.     Cross-Defendants and each of them had a duty to disclose the existence of the above-mentioned conditions and other latent defects of which they had or should have had knowledge.

52.     Cross-Defendants and each of them failed to disclose the existence of the above-mentioned conditions and other latent defects of which they had or should have had knowledge to Cross-Complainants.

53.     As a legal consequence of cross-defendants' failure to disclose as alleged above, Cross-Complainants have suffered damages, including but not limited to costs of inspections, costs of repair, and lost rent.

54.     In failing to disclose as alleged above, cross-defendants and each of them acted maliciously, oppressively, with fraudulent intent and in conscious disregard of the rights of Cross-Complainants.

[PROPOSED] SECOND AMENDED CROSS-COMPLAINT

## SECOND CAUSE OF ACTION

**(Intentional Misrepresentation - Against Craig Greenwood, Kevin Nord, Sec Pac, Inc. dba**

**Security Pacific Real Estate,  Michael Richard Clancy, Richard Joseph Clancy)**

55.     Cross-Complainants incorporate herein by reference the allegations set forth in paragraphs 1 through 54 above.

56.     Cross-Complainants and each of them represented to cross-defendants that the Property was in habitable condition and free from major structural defects that would require extensive reconstruction or demolition.

57.     In making the foregoing representations, cross-defendants and each of them knew that the representations were false and that Cross-Complainants would rely on them in deciding to purchase the Property.

58.     In justifiable reliance upon cross-defendants' representations, Cross-Complainants did purchase the Property.  Had they known that the foregoing representations were false, cross-defendants would not have purchased the Property.

59.     As a legal consequence of cross-defendants' intentional misrepresentations as alleged above, Cross-Complainants have suffered damages, including but not limited to costs of inspections, costs of repair, and lost rent.

60.     In making the foregoing false representations cross-defendants and each of them acted maliciously, oppressively, with fraudulent intent and in conscious disregard of the rights of Cross-Complainants.

## THIRD CAUSE OF ACTION

**(Negligent Misrepresentation - Against Craig Greenwood, Kevin Nord, Sec Pac, Inc. dba**

**Security Pacific Real Estate,  Michael Richard Clancy, Richard Joseph Clancy)**

61.     Cross-Complainants incorporate herein by reference the allegations set forth in paragraphs 1 through 60 above.

62.     Cross-Complainants and each of them represented to cross-defendants that the Property was in habitable condition and free from major structural defects that would require extensive reconstruction or demolition.

63.    In making the foregoing representations, cross-defendants and each of them should have known that the representations were false and acted in reckless and negligent disregard of their truth or falsity, knowing that Cross-Complainants would rely on them in deciding to purchase the Property.

64.    In justifiable reliance upon cross-defendants' representations, Cross-Complainants did purchase the Property. Had they known that the foregoing representations were false, cross-defendants would not have purchased the Property.

65.    As a legal consequence of cross-defendants' misrepresentations as alleged above, Cross-Complainants have suffered damages, including but not limited to costs of inspections, costs of repair, and lost rent.

**FOURTH CAUSE OF ACTION**

**(Fraud, Dishonest Dealing and Breach of Fiduciary Duty - Against Kevin Nord, Sec Pac Inc. dba Security Pacific Real Estate,  Michael Richard Clancy, Richard Joseph Clancy)**

66.    Cross-Complainants incorporate herein by reference the allegations set forth in paragraphs 1 through 65 above.

67.    In making the above alleged representations and failures to disclose, cross-defendants and each of them committed fraud and dishonest dealing and breached their fiduciary duties in violation of their professional obligations to Cross-Complainants.

68.    As a legal consequence of cross-defendants' violation of their professional obligations as alleged above, Cross-Complainants have suffered damages, including but not limited to costs of inspections, costs of repair, and lost rent.

69.    In breaching their professional obligations as represented above, cross-defendants and each of them acted maliciously, oppressively, with fraudulent intent and in conscious disregard of the rights of Cross-Complainants.

**FIFTH CAUSE OF ACTION**

**(Professional Negligence -Against Kevin Nord, Sec Pac, Inc. dba Security Pacific Real Estate, Michael Richard Clancy, Richard Joseph Clancy)**

70.    Cross-Complainants incorporate herein by reference the allegations set forth in

paragraphs 1 through 69 above.

71.     In making the above alleged representations and failures to disclose, cross-defendants and each of them breached the professional standard of care for licensed real estate salespersons and brokers.

72.     As a legal consequence of cross-defendants' violation of their professional obligations as alleged above, Cross-Complainants have suffered damages, including but not limited to costs of inspections, costs of repair, and lost rent.

73.     In breaching their professional obligations as represented above, cross-defendants and each of them acted maliciously, oppressively, with fraudulent intent and in conscious disregard of the rights of Cross-Complainants.

## SIXTH CAUSE OF ACTION

### (Breach of Contract - Against Cross-Defendants Perla Vega, Barbara Vega and Norma Salazar)

74.     Cross-Complainants incorporate herein by reference the allegations set forth in paragraphs 1 through 73 above.

75.     Cross-Defendants and each of them are parties to rental agreements pursuant to which they are obligated to pay rent and are subject to late fees and other penalties for breach of their contractual obligations.

76.     Cross-defendant Barbara Vega owes plaintiff $2,721.43 for rent and $325 late fees plus $750 for eviction retainer, for a total of  $3,796.43.

77.     Perla Vega owes $774.29 for rent and $90 late fee for a  total $864.29.

78.     Norma Salazar owes $428.57 for rent.

## SEVENTH CAUSE OF ACTION

### (Waste - Against Barbara Vega, Treble Damages [Code Civ. Proc. § 732] )

79.     Cross-Complainants incorporate herein by reference the allegations set forth in paragraphs 1 through 78 above.

80.     Cross-Defendant Barbara Vega committed waste by, among other things, breaking two windows, knocking several holes in the bedroom wall and pulling electrical wiring out of the walls.

The cost to repair the damages caused by cross-defendant's waste amount to at least $679.32.  Cross-Defendant is liable for treble damages pursuant to Code of Civil Procedure section 732.

**EIGHTH CAUSE OF ACTION**

**(Equitable and Comparative Indemnity - Against all Cross-Defendants)**

81.     Cross-Complainants incorporate herein by reference the allegation set forth in paragraphs 1 through 80 above.

82.     Cross-Complainants are not liable for the events, occurrences and damages alleged in the complaint.  Cross-Complainants also allege that cross-defendants and each of them are responsible for the occurrences, acts and/or omissions alleged by plaintiffs in their complaint and upon which plaintiffs predicate their allegations of liability.

83.     Cross-Complainants deny liability in any manner for the injuries and damages claimed by plaintiffs in their complaint.  If Cross-Complainants are held liable, it will be entirely on account of the primary wrongful conduct, breaches of contract, negligence, breaches of fiduciary duty and bad faith on the part of the cross-defendants.  Any liability that Cross-Complainants may incur as a result of plaintiffs' complaint will be a result of Cross-Complainants's passive and secondary liability, and more importantly as a result of the acts and primary negligence, contributory liability and other misconduct of cross-defendants, and each of them.  Therefore, Cross-Complainants are entitled to indemnity from cross-defendants for any damages, costs or attorneys' fees awarded against them and in favor of any other party as well as the attorneys' fees and costs incurred by Cross-Complainants in defense of this action.

84.     If in fact it is determined that Cross-Complainants are not entitled to be fully indemnified by said cross-defendants, and each of them, Cross-Complainants allege that said cross-defendants, and each of them, and other parties to this action, would be concurrent tortfeasors and, based upon the law set forth in *American Motorcycle Association v. Superior Court* (1978) 20 Cal.3d 578, Cross-Complainants are entitled to partial indemnity, partial contribution or equitable indemnity from said cross-defendants and each of them.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NINTH CAUSE OF ACTION**

**Intentional Misrepresentation By Public Employees (Govt. Code § 822.2)**

**(Against City of Pittsburg Building Officials John Little and K.C. Kampton**)

85.    Cross-Complainants incorporate herein by reference the allegations set forth in paragraphs 1 through 84 above.

86.    City of Pittsburg Building Inspectors, John Little ("Little") and K.C. Kampton ("Kampton"), had a duty to inspect buildings for health and safety purposes.

87.    City of Pittsburg Building Inspectors are required to disapprove construction which violates the minimum standards of the Uniform Building Code and the Pittsburg Municipal Code.

88.    On January 30, 2002, the Pittsburg Police Department along with Kampton.  They found numerous building code violations that threatened the health and safety of the tenants who resided at the Property.  On February 7, 2002, the Pittsburg Police Department issued a Notice of Public Nuisance to Greenwood finding, among other things, that the Property itself was structurally unsafe and dangerous.  Moreover, the Community Development Department issued its Official Notice to Greenwood demanding compliance with the building and construction ordinances.

89.    A hearing took place on February 28, 2002 regarding the costs of an abatement of the condemned Property.  The City issued its March 5, 2002 Decision which ordered Greenwood to comply with all requests from the City of Pittsburg Chief Building Official.  According to March 5, 2002 "Findings and Decision," Greenwood stated that he offered to assist his tenants to move out. Greenwood stated that he intended to sell the building and either he or the new owner would make all of the repairs.

90.    Shortly thereafter, Greenwood listed the Property on the market for sale with Nord and the Cross-Complainants entered into contract with Greenwood to purchase the Property.  The Cross-Complainants purchased the Property for investment purposes and did not intend, nor ever did, live on the Property.

91.    On September 18, 2002, Nord issued a letter to John Little at the City of Pittsburg demanding a Release of Property Violations and a Certificate of Occupancy.

92.    On September 19, 2002, Little issued a Certificate of Occupancy.  Cross-Complainants

[PROPOSED] SECOND AMENDED CROSS-COMPLAINT

1  further allege on information and belief that no permits were pulled for repairs and no inspections were

2  completed which addressed the City of Pittsburg's March 5, 2002 "Findings and Decision."

3        93.  Cross-Complainants further allege on information and belief that the two inspectors knew

4  that the Property was in violation of the building code and was also not in accordance with the

5  habitability requirements under the Health and Safety Code.  The City of Pittsburg Building Inspectors

6  issued a Certificate of Occupancy to Craig Greenwood and Kevin Nord during escrow.   Cross-

7  Complainants relied upon this Certificate of Occupancy from the City of Pittsburg Building Inspectors

8  to complete their purchase of the Property.

9                                      **TENTH CAUSE OF ACTION**

10                       **Violation of California Constitution, Art. I, Sec. 19**

11              **Inverse Condemnation:  Regulatory Taking Without Just Compensation**

12                                      **(Against City of Pittsburg)**

13        94.      Cross-Complainants incorporate herein by reference the allegations set forth in

14  paragraphs 1 through 93 above.

15        95.      Cross-Complainants purchased the Property for investment purposes.  The Cross-

16  Complainants never intended nor ever lived on the Property.  Cross-Complainants heavily invested

17  in the Property with capital, a secured debt, repair costs, improvement costs, etc.

18        96.      Cross-Complainants had investment-backed expectations that the Property would return

19  on their investment by tenant rents and equity.

20        97.      The City took Cross-Complainants property in its exercise of eminent domain without

21  payment of just compensation or institution of proceedings for the assessment of such compensation.

22  During Greenwood's ownership, the City issued numerous violations against the Property and declared

23  it structurally unsafe.  Nevertheless, the City issued a Certificate of Occupancy during escrow without

24  proof that Greenwood complied with repairing all building violations.  This Certificate of Occupancy

25  declared that all violations were removed and the building met all health, safety and building codes.

26  Shortly after the escrow period concluded, however, the City cited Cross-Complainants with the same

27  violations and condemned the Property as uninhabitable.

28

98.     The City's acts proximately caused the Cross-Complainants to be deprived of their investment-backed expectations, property and property rights.  By issuing a Certificate of Occupancy knowing of conditions that the City would later use to justify ordering the property to be vacated, and failing to provide any opportunity to be heard or to contest the City's actions, the City deprived Cross-Complainants of their property without due process of law in violation of Article I section 7(a) of the California Constitution.

99.     Cross-defendants' misconduct amounted to a regulatory taking when they improperly issued the September 19, 2002 Certificate of Occupancy to Greenwood despite Greenwood's failure to comply with all the building, health and safety regulatory requirements under the City's municipal codes.  Cross-Complainants justifiably relied upon this Certificate of Occupancy and closed escrow. Subsequently, the Cross-defendants cited Cross-Complainants with the same violations that they cited Greenwood. The City then completely condemned the Property.  This condemnation denied the Cross-Complainants the economically viable use of their investment-backed expectations land.

100.    As a legal consequence of cross-defendants' violation as alleged above, Cross-Complainants have suffered damages, including but not limited to costs of inspections, costs of repair, loss of equity, and lost rents.

101.    Cross-defendants' improper issuance of the September 19, 2002 Certificate of Occupancy during escrow which Cross-Complainants reasonably relied upon to complete their investment purchase caused Cross-Complainants to be deprived of their investment-backed expectations of the Property, without due process of law nor just compensation.

102.    As a result of the Cross-Defendants' actions and condemnation, the Cross-Complainants were injured and were forced to initiate this action to recover just compensation due their significant loss of all viable economic use.

WHEREFORE, Cross-Complainants demand judgment against cross-defendants for the following:

1.      For compensatory and consequential damages;

2.      For exemplary and punitive damages;

[PROPOSED] SECOND AMENDED CROSS-COMPLAINT

1

      3.     For attorneys' fees and costs of suit;

2

      4.     For inverse condemnation, costs and fees under Code of Civil Procedure § 1036; and

3

      5.     For such other and further relief as the Court deems just.

4

5

DATED:  _____, 2007         ATWOOD, HAIMAN & WESTERBERG

6

7

                      By:_____

8

                      ERIC S. HAIMAN
                      Attorneys for Cross-Complainants

9

                      PAUL G. ROBINSON, DIANNE EVANS,
                      and OPEN HEARTH LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] SECOND AMENDED CROSS-COMPLAINT